IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TERRANCE J. SHAW,

                    Plaintiff,                      OPINION and ORDER

    v.

                                    15-cv-511-wmc

EDWARD WALL, SANDY DEYOUNG,
KATHY SABEL, MICHAEL TURNER,
SERGEANT HUNT, JENNIFER DELVAUX,
and SERGEANT COOK,

                    Defendants.

In retaliation for a lawsuit he filed against prison staff at Oshkosh Correctional Institution, *pro se* plaintiff Terrance Shaw claims that he was transferred to Racine Correctional Institution, as well as subjected to other adverse actions.  Shaw also claims that his Eighth Amendment rights were violated when he was denied a wheelchair.   Before the court are cross motions for summary judgment.  After reviewing the parties' submissions, the court concludes that defendants are entitled to summary judgment on all of plaintiff's claims.

PRELIMINARY MOTIONS

In addition to the cross motions for summary judgment, there are several additional motions that have essentially been rendered moot by the court's ruling.  To avoid any argument that either motion might have changed the outcome, however, the court will briefly address them.  *First*, plaintiff filed two motions for assistance in recruiting counsel. (Dkt. #30, 34, 94.)  Those motions will be denied because the complexity of this case did not exceed plaintiff's ability to litigate it on his own.  *See Pruitt v. Mote*, 503 F.3d 647, 654, 656 (7th Cir. 2007).  Plaintiff has been a strong advocate for himself and demonstrated a

clear understanding of applicable law and court procedures.  His claims are being dismissed solely because the undisputed evidence does not support his legal theories.  Legal representation would not have changed that.

*Second*, plaintiff filed several motions seeking assistance with obtaining and/or certifying medical exhibits relating to treatment and tests he received.  (Dkts. ##84, 89, 94).  Those motions will simply be denied as moot because none of the information contained from those medical exhibits would affect the outcome of the court's decision on the merits.  The court is not dismissing plaintiff's claims based on his failure to prove serious medical need or injury.  Rather, plaintiff's claims fail because he has failed to prove that any defendant acted with retaliatory motive or deliberate indifference to his medical needs.

## UNDISPUTED FACTS[1]

### I.  Parties and Background

Plaintiff Terrance Shaw is an inmate at Racine Correctional Institution, where he has been housed since October 13, 2015.  Before his transfer, Shaw had been housed at Oshkosh Correctional Institution since April 2004.  While at Oshkosh, Shaw was housed in a few different units, including the W Building, where he was housed from December 6, 2012 until his transfer to Racine.

Defendants include several DOC employees who worked at Oshkosh during this relevant time period:  Sandy DeYoung, a social worker; Kathy Sabel and Jennifer Delvaux,

---

[1] The court finds the following facts material and undisputed unless otherwise noted.  The facts are drawn from the parties' proposed findings of facts and responses.

unit managers of the W Building; Michael Turner, a correctional officer; Christopher Hunt, a correctional sergeant; and Keith Cook, a correctional sergeant.

## II.    Shaw's 2012 Lawsuit

Oshkosh maintains a canteen, which is an in-house store, where inmates can purchase approved items, such as snacks, personal hygiene products, and writing supplies. Inmates access the canteen according to where they are housed.  For those in the W Building, where Shaw was housed from 2012 to 2015, inmates are sent to the canteen in groups of approximately 10 to 12 inmates.  The first group to visit the canteen consists of inmates who require special medical accommodations, such as a wheelchair, walker or assistance of an inmate aide, based on medical directives from the Health Services Unit ("HSU").

In 2012, Shaw filed a lawsuit against certain Oshkosh staff, Case No. 12-cv-497-wmc, alleging that he was inappropriately put in one of the last groups to go to the canteen because of an alleged disability ("2012 lawsuit").  At the time, Shaw used a wheelchair and an inmate aide to access the canteen, though he did not have medical clearance from HSU for either.   None of the defendants in this case were named as defendants in the 2012 lawsuit, although defendant Sabel became aware of that lawsuit in early 2014, when she was asked to provide affidavits regarding some of the issues involving the movement of inmate groups from the W Building to canteen.

### III.   Shaw's Excess Legal Documents

In late 2014, while the 2012 lawsuit was still pending, Shaw's cellmate complained to defendant Sabel that Shaw had too many legal materials and other property in his cell.[2] At that time, according to Shaw, he had about 30 years' worth of property in his cell. Nonetheless, his cell had been searched approximately once per month, and he had never been required to get rid of excess property.

Under DOC policy, however, there are limitations on the amount of property an inmate can possess for both security and space reasons.  With respect to legal property in particular, regulations limit an inmate to that which can fit into a receptacle no larger than 20"x20"x20" or 8000 cubic inches, though the warden can authorize additional storage space on a temporary basis for any inmate who establishes a need for the additional space based on on-going litigation.

Sabel concluded that she could not allow Shaw to keep his excess legal materials in his cell, because doing so would be unfair to his cellmate and posed a risk to the safety and security of the unit.  She also wanted to avoid a situation in which Shaw's cellmate or other inmates became hostile to Shaw because of the excess materials, as permitted space and property are common areas of contention among inmates.

On September 3, 2014, Sabel, DeYoung and Turner met with Shaw in Sabel's office and advised him that he had too many legal documents in his cell.  Shaw was given 5 days

---

[2] Shaw objects to consideration of this statement on hearsay grounds, because it is based on Sabel's declaration, rather than the declaration of his cellmate.  The court is not considering the cellmate's statement for the truth of the matter asserted, however, but just for the fact that the statement was made.  In other words, the court is not relying on the cellmate's statement to find that Shaw *actually* had too many legal papers and property in his cell.  Thus, Shaw's objection is unfounded. Regardless, Shaw concedes that he had more legal property in his cell than was permitted by prison policy.  (*See* Plt.'s Resp. to Dfts.' PFOF 45.)

to come into compliance with Oshkosh's property policies or receive a conduct report. Although defendants could have given him a conduct report at that point, they decided not to do so because they believed Shaw would make efforts to reduce his property on his own. For his reference, Shaw was even given a 20"x20"x20" legal box to use in determining the permissible amount of legal materials.

Although Shaw disputes it, defendants also told Shaw he could either (a) send out or dispose of his excess legal documents, or (b) contact the warden for a waiver.  Defendants further aver telling Shaw that they would identify a location within the unit to place the "overflow" legal documents on a temporary short term basis if the warden approved a waiver.  Shaw denies being told that he could contact the warden for a waiver, but concedes that this option is set forth in the prison's property policies and that those policies were available for his review.  He also concedes that DeYoung, Sabel and Turner did not tell him that he had to *destroy* his documents.

Within the next few days after the September 3 meeting, Shaw started disposing of legal property on his own.  By September 10, Shaw had removed and discarded the excess legal materials from his cell in prison trashcans.  Shaw ultimately claims he destroyed 36,000 pages of legal papers.  Shaw later filed a document in the 2012 lawsuit claiming that Sabel and DeYoung had forced him to destroy his litigation documents.  Neither Sabel nor DeYoung found out about Shaw's filing, however, until after Shaw settled that lawsuit and filed this one.

**IV.    Settlement of the 2012 Lawsuit and Shaw's Access to the Unit Wheelchairs**

The W Building has 4 wheelchairs that inmates with documented medical needs may use to travel to and from other areas of the prison, including the library and canteen.  In order for an inmate to be assigned an inmate aide and/or a wheelchair under prison policy, he must be disabled or have a special need as determined by HSU.  If HSU further determines that an inmate needs assistance with the wheelchair, the inmate who is employed on the unit as an aide will push the inmate's wheelchair.  The disability and/or special need must be documented in the inmate's medical records.

During the course of the 2012 lawsuit, Oshkosh Warden Judy Smith, who is not a party to this action, found out that unit staff permitted Shaw to use a wheelchair and an aide occasionally without proper medical authorization.  According to Shaw, he used the wheelchair and inmate aide to assist him whenever he had to travel long distances or carry his canteen purchases.  Defendant Hunt, who worked on Shaw's unit, was aware that Shaw occasionally used the wheelchair.  Hunt never denied Shaw access to the wheelchair.

To settle the 2012 lawsuit, Warden Smith and others sought to put Shaw in the disabled group of inmates that use a walker or wheelchair, and accordingly were allowed to go first to canteen.  The easiest way to qualify Shaw for that group was to get medical clearance from HSU for his use of a walker or wheelchair.  That way, Shaw would be in compliance with prison policy and it would not look to other inmates like Shaw was receiving special treatment.  Shaw was thus asked to be assessed by the HSU in order to get the appropriate medical clearance that would qualify him to go to the canteen with the first group of disabled inmates.  Shaw agreed to this.

The HSU manager then asked Nurse Nancy Bowens to evaluate Shaw to determine if he needed any adaptive devices.  Such evaluations -- regarding whether inmates need any type of special accommodation or adaptive devices based on medical needs -- were a regular part of Nurse Bowens' duties.  Nurse Bowens was not told that that the evaluation was relevant to a lawsuit.

Nurse Bowens evaluated Shaw on June 23, 2015.  Shaw told Bowens that he walked approximately one-half mile each day for exercise and that he was able to walk from the W Building to the library without chest pain.  Shaw also reported that he would have a twinge in the middle of his chest if he had to make multiple trips back and forth from his unit, but that he responded well to one tablet of sublingual nitroglycerin.  Based on the examination and information she received, Nurse Bowens concluded that Shaw needed adaptive devices in the form of state-issued Velcro closure footwear, because he was having difficulties tying his shoes.  Bowens also recommended that Shaw see an occupational therapist for a consultation regarding the need for additional adaptive devices.

Shaw declined the latter recommendation, saying he had multiple pending cases and did not want to risk not being able to attend court on the days that cases were scheduled.  Nurse Bowens informed him, and Shaw acknowledged that he understood, that his refusal to see the occupational therapist limited her ability to determine what adaptive devices would be beneficial.

On June 24, 2015, the day after the assessment, the Unit Manager for the W Building, Jennifer Delvaux, was informed by the HSU manager that Shaw had been evaluated and determined not to need a wheelchair, and that as a result there remained no documented medical reason in his chart for such an accommodation.  That same day,

Delvaux informed staff on her unit that Shaw should no longer be permitted to use the wheelchair, including Sergeant Hunt.  That was the first time Hunt was ordered by a superior not to allow Shaw to use the wheelchair.

Warden Smith was surprised by Nurse Bowens' determination that Shaw did not need a wheelchair.  She nonetheless decided to put Shaw with this first group of disabled inmates for the canteen in order to resolve the 2012 lawsuit.  That lawsuit settled on June 25, 2015.  The same day, Delvaux informed unit staff that Shaw could go to the canteen with the first group of inmates and that he was to be assisted by an aide in order to carry items or push the canteen cart, but she reiterated that Shaw was still not permitted to use the wheelchair.

On July 15, 2015, Delvaux found out that Shaw had used one of the unit wheelchairs to go to the library.  She immediately called HSU to check whether Shaw now had an order for a wheelchair.  After being told that Shaw was still not approved, Delvaux called Sergeant Hunt, who was on duty, and asked that Shaw be required to return the wheelchair to the unit.  In compliance, Hunt then called library staff and had Shaw return the wheelchair to the unit immediately, without the assistance of an aide.  When Shaw returned to the unit, Hunt's shift had already concluded, and he had left for the day.  The officers on duty, Sergeant Nelson and Lieutenant Bubolz, reminded Shaw that he could no longer use a wheelchair and inmate aide.  Sergeant Nelson also put a note in the unit log book that, per Unit Manager Delvaux and Nurse Bowens, Shaw was still not permitted to use the wheelchair.

For the next several weeks, Shaw walked everywhere without a wheelchair or an aide. He also accessed the canteen and library at about the same frequency, even though he was

not allowed to use the wheelchair.  Shaw claims that these activities caused him serious pain in his knee, extreme exhaustion and tightness in his chest.

On August 19, 2015, Shaw submitted an HSU request complaining of increased heart pain and shortness of breath.  Nurse Bowens evaluated Shaw that same day.  During that assessment, Shaw reported a need for increased nitroglycerin due to chest pain.  He also reported increased episodes of chest pain, which resolved after one to two minutes of rest.

After the visit, Bowens gave Shaw a special medical restriction for a wheelchair and wheelchair pusher, following which he was permitted to use his unit's wheelchairs and an inmate aide.  Bowens also discussed his need for a cardiology consultation.

That same day, August 19, Unit Manager Delvaux informed Hunt that Shaw had been issued a personal wheelchair from HSU.  This was also noted in the unit logbook for all unit staff to see.  From August 19, 2015, until Shaw was transferred to Racine in October 2015, he was allowed to use the wheelchair based on his documented medical need.


**V.     Mail Incident with Sergeant Cook**

As part of his duties, Sergeant Keith Cook was required to open and inspect outgoing inmate mail to check for contraband and other rule violations.  On July 2, 2015, Shaw placed a copy of the settlement agreement from the 2012 lawsuit in a letter for mailing to an inmate paralegal, Vances Hernandez-Smith, who was housed at a different institution. Sergeant Cook was working third shift (10:30 p.m. to 6:30 a.m.) that day and was sorting and inspecting inmate mail in the W Building where Shaw was housed, when he came across the envelope.

9

After opening the envelope and inspecting its contents, Cook concluded that sending the settlement agreement to another inmate was impermissible because legal mail could not be mailed between inmates at different institutions.   Accordingly, Cook called Shaw to the officer station and told him that his mail would not be delivered.   Shaw insisted that sending legal mail between inmates was allowed.   He also presented Cook with a portion of Oshkosh's Institution Handbook which states, in accordance with Wis. Admin. Code § DOC 309.155(5), that (a) inmates providing legal services to other inmates may *only* exchange legal paperwork through the U.S. Mail, and (b) the contents of the envelope will be reviewed by staff to verify that it is in fact legal mail.   Based on this information, Cook concluded that legal mail between inmates was permitted.

Plaintiff says that Cook was angry and agitated during the exchange, while Cook denies this.   There is no dispute, however, that Cook acknowledged his mistake and informed Shaw that the settlement agreement would be mailed out.   Cook  then  sealed  the envelope containing the settlement agreement and put it with the rest of the compliant mail from the mailbox.   The mail was then picked up during third shift, by another officer assigned to pick up mail from all housing units.   That officer delivered the mail to Oshkosh's mailroom for delivery to the post office during the next shift.

After the mail was picked up by the other officer, Cook had no further involvement with that mail.   On July 13, 2015, however, Vances Hernandez-Smith received a copy of Shaw's letter *without* the settlement agreement enclosed.

## VI.    Shaw's Annual Review and Subsequent Transfer to Racine

From 2012 to 2015, Shaw had a medium custody classification, and was housed at Oshkosh, which is a medium-security facility.  While at Oshkosh, Shaw was scheduled for his statutorily-mandated annual review before the institution's reclassification committee in July of each year.  The purpose of this annual review is to review an inmate's custody and placement, as well as his program and treatment assignments.  In doing so, the committee takes into consideration many factors, including a report that must be prepared by the inmate's assigned social worker.  The reclassification committee then makes a recommendation to the Director of Bureau of Offender Classification and Movement regarding each inmate's custody, placement and assignments.  The vote must be unanimous in order for the reclassification committee to recommend a change in the inmate's custody classification or placement.

W Building Social Worker Sandy DeYoung was assigned to Shaw from December 6, 2012, to June 13, 2015.  In June 2015, DeYoung electronically submitted her reclassification report for his July 2015 annual reclassification hearing.  DeYoung recommended that Shaw be transferred to another institution because he had been at Oshkosh for many years, and she believed that a change in institutions would help in all phases of Shaw's life.  DeYoung began working on her report on May 11, 2015.  At that time, she had the "general idea" that a transfer would be best for Shaw, which was confirmed on June 11, 2015, when she interviewed Shaw and formally recommended transfer.

According to defendants, DeYoung's recommendation was not surprising because inmates are generally recommended for transfer once they have been housed at institutions

for "long periods of time." This is because inmates and staff can become complacent when they are together for too long. For example, the inmate may get too familiar with the staff, staff duties, staff personalities, the layout of the institution, and the structure of the facility. This is cause for concern, as it can cause flight risk and/or lead to staff assaults or fraternization. In 2015, DeYoung believed that these concerns warranted a change in environment for Shaw, who had been housed at Oshkosh for 11 years.

Whenever she was reviewing an inmate who had been at the institution for more than 7 years, DeYoung would as a regular practice discuss the need to transfer to another unit or institution with that inmate, the offender classification specialist and other senior staff. Thus, DeYoung had discussed transfer with Shaw on multiple occasions before giving her formal recommendation in 2015. According to Shaw, DeYoung had told him that he seemed unhappy at Oshkosh, and she had asked him repeatedly why he did not request a transfer. Shaw says that he responded to her inquiries by saying that he was unhappy, but that he just felt like he needed to stand up for his rights.

On July 8, 2015, Shaw had his prescheduled reclassification hearing. His unit manager, Delvaux, was serving on the reclassification committee at the time as part of her regular rotation. Shaw appeared at the hearing and presented his concerns. Shaw maintained that he was being considered for transfer in retaliation for a recent lawsuit against "offending DOC staff." The chair of the classification committee, Michael Treder, told Shaw that the timing of his review was compelled by statute. Ultimately, the committee unanimously recommended to the Director that Shaw be transferred to another medium-custody institution in Racine.

According to defendants, the committee's primary motivation for transfer was the Shaw had been at Oshkosh for too long, making his transfer important for institution security, for staff awareness, and to provide the inmate with a new environment. The committee also noted that Shaw would be able to meet his health and offense-related treatment needs at Racine. After the Director approved Shaw's transfer, he appealed, but that decision was affirmed.

In October 2015, Shaw was transferred to Racine. The transfer to Racine has not inhibited Shaw's ability to access the courts. While at Racine, Shaw has actively litigated this lawsuit, and he recently filed a document in this case threatening to file another lawsuit against staff at Racine.


OPINION

Plaintiff was granted leave to proceed on claims that:

(1)     defendants Sabel, Turner and DeYoung retaliated against him by forcing him to destroy his litigation documents;

(2)     defendant Cook retaliated against him by discarding his legal mail;

(3)     defendants Delvaux and Hunt retaliated against him by denying him access to a wheelchair;

(4)     defendant DeYoung violated the First Amendment by causing him to be transferred against his will; and

(5)     defendants Delvaux and Hunt violated the Eighth Amendment by prohibiting him from using a wheelchair that he needed.

In considering these varied claims, the court will take up all retaliation claims first, and then turn to his Eighth Amendment claims.

13

## I.      First Amendment Retaliation.

Plaintiff claims that defendants Delvaux, Sabel, Turner, DeYoung and Cook violated his rights under the First Amendment by taking various adverse actions again him in retaliation for his 2012 lawsuit.   To prevail on a First Amendment retaliation claim, plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that likely would deter future First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the defendant's decision to take retaliatory action.   *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).   While plaintiff's 2012 lawsuit was certainly protected activity, and at least some of the claimed retaliatory acts may have a deterring effect, each of plaintiff's claims fails on the third prong, as he has adduced *no* evidence from which a reasonable jury could find that defendants acted with retaliatory purpose.

### A.      Destruction of Legal Documents

Plaintiff argues that defendants Sabel, Turner and DeYoung ordered him to destroy 36,000 pages of his legal documents in retaliation for his 2012 lawsuit.   As an initial matter, however, there is no evidence that defendant Turner was even aware of the 2012 lawsuit at the time of the meeting with plaintiff regarding his excess legal documents.   This alone entitles Turner to summary judgment.   *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006) (defendants must have had actual knowledge of the protected activity for their actions to be retaliatory); *Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009) (same).

14

With respect to the other defendants -- Sabel and DeYoung -- there is no evidence to support plaintiff's claim that they were motivated by the 2012 lawsuit.  Instead, they told plaintiff directly that he needed to destroy or remove his property because:  (1) he had too much of it; (2) his property was taking up most of the room in his cell; and (3) his cellmate had complained.  *See Devbrow*, 735 F.3d at 588 (granting summary judgment where the only evidence indicated that the defendants removed the inmate's "excessive legal materials to eliminate a fire hazard and to make it easier for officials to conduct searches and inventories of offenders' property during prison searches, not to retaliate against him").

The undisputed facts support defendants' explanation for their actions.  It is undisputed that plaintiff had more legal materials in his cell than was allowed under DAI and institution policy.  Under the applicable policies, inmates may keep only one receptacle no larger than 20"x20"x20" or 8000 cubic inches of legal materials in their cell.  In contrast, plaintiff apparently had 36,000 pages *over and above* that limit.  Further, plaintiff submitted no evidence to refute defendants' statement that plaintiff's cellmate complained about plaintiff's excess property.  Although plaintiff states that his cellmate had willingly agreed to be housed with him despite knowing about plaintiff's excess property, plaintiff's statement is not sufficient to dispute defendants' assertion that his cellmate later complained.

Instead of proof, plaintiff offers two arguments as to why he believes defendants had a retaliatory motive.  First, he argues that property limitations had never been enforced against him despite his cell being searched a number of times over the years.  This argument, however, is undermined by defendants' unrefuted assertion that the decision to enforce the property limitations in September 2014 was prompted by a complaint by plaintiff's cellmate.  Additionally, plaintiff has submitted no evidence that the named

defendants, *Sabel or DeYoung*, had previously searched his cell and allowed him to keep excess property.

Second, plaintiff argues that because his 2012 lawsuit was ongoing, and because Sabel had provided an affidavit in the 2012 lawsuit, these defendants must have retaliated against him. But the Seventh Circuit "ha[s] stated on many occasions, [that] 'timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim.'" *Springer v. Durflinger*, 518 F.3d 479, 485 (7th Cir. 2008). Nor is speculation about a defendant's underlying motives. *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) ("[S]peculation regarding the officers' motive cannot overcome the contrary evidence that . . . [the officer's] actions were benign.").

Here, defendants were not named in the 2012 lawsuit, and plaintiff has not alleged that they had any particular stake in the outcome of it. He does not allege that they mentioned the 2012 lawsuit at all during discussion of his legal materials. He does not even suggest that the 36,000 documents he ultimately destroyed were somehow relevant to the 2012 lawsuit, nor any other pending lawsuit, nor that defendants had reason to believe that requiring plaintiff to remove excess legal documents would somehow provide an advantage in that or any other lawsuit.

In short, plaintiff has submitted *no* evidence that would refute or undermine defendants' purported reasons for instructing him to reduce his property; nor has he submitted any evidence supporting a relationship between the 2012 lawsuit and defendants' enforcement of the property limitations. Because plaintiff has failed to create a genuine dispute regarding the motivations for defendants' enforcement of the property limitation against him, defendants are entitled to summary judgment on this claim.

### B.   Cook's Handling of Plaintiff's Mail

Plaintiff next argues that Cook destroyed his mail in retaliation for the 2012 lawsuit. Specifically, he argues that Cook destroyed or otherwise prevented him from mailing a copy of the settlement agreement from the 2012 lawsuit to an inmate at another institution. This claim fails, however, because plaintiff has produced *no* evidence that Cook actually destroyed his mail. Instead, the only evidence is that Cook held plaintiff's mail for a few hours because he mistakenly believed inmates could not send legal mail to each other. Plus, Cook promptly notified plaintiff that he could not send the settlement agreement under policy. Finally, and most persuasive, after plaintiff corrected him, Cook agreed that he had been mistaken about the rule and told plaintiff that he would mail out the agreement. Nothing about these facts suggests retaliation. *Davis v. Haines*, No. 07-CV-667-SLC, 2008 WL 2610144, at *1 (W.D. Wis. July 1, 2008) ("A genuine mistake is not a constitutional violation.")

Moreover, it is important to note that the delay in processing plaintiff's mail was less than a single day. Even if there had been evidence that Cook's temporary holding of plaintiff's mail was retaliatory, such a brief delay does not rise to the level of a constitutional violation. For example, no reasonable jury would conclude that person of ordinary firmness would be deterred from engaging in First Amendment protected activity by a brief delay in the processing of his mail. *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("[T]rivial harms, petty slights, [and] minor annoyances" do not rise to the level of a materially adverse action necessary to sustain a retaliation claim); *Willis v. Washington*, 172 F.3d 54, *1 (7th Cir. 1999) (unpublished) (stating that "temporary inconveniences" are not sufficient to state claim for retaliation).

While plaintiff points out that when his letter reached the intended recipient, it nevertheless did not contain the settlement agreement, plaintiff can only speculate that Cook actually destroyed the agreement rather than mailing it out (despite what he said he would do).  Since plaintiff has no evidence to support his speculation, he argues instead that Cook's version of events is unbelievable, because there is no way Cook actually believed inmates could not send legal documents to each other from the outset.  Cook had been processing mail since September 2012, argues plaintiff, and the rule allowing inmates to send legal documents through U.S. mail had been in place since August 2012.  Further, plaintiff states that prison staff had never before prevented or delayed him from sending legal mail to another inmate until the incident with Cook.  Thus, plaintiff argues, a reasonable jury could *infer* that Cook was so motivated to prevent plaintiff's settlement agreement from reaching the other inmate that he first pretended not to understand the regulations and, when that did not work, destroyed the settlement agreement.

Again, however, these arguments about what "could" have happened are supported by nothing but speculation.  Plaintiff has no evidence that Cook fabricated his statements that he thought inmates could not mail legal property to inmates at other institutions; nor does he have evidence that Cook allowed him to send legal documents to other inmates on prior occasions.

As importantly, he continues to offer no evidence to support his claim that Cook would even have been motivated to retaliate because of the 2012 lawsuit.  For example, Cook was not a named defendant in the 2012 lawsuit; nor does plaintiff allege that Cook mentioned the 2012 lawsuit during the exchange about settlement agreement.  Instead, the undisputed evidence is that Cook was aware of the 2012 lawsuit only after briefly reviewing

18

the settlement agreement while inspecting plaintiff's mail.  Cook was (and still is) unaware of the claims or defendants involved in that lawsuit.

In short, plaintiff's claim against Cook is based on pure speculation, which is not enough to defeat defendants' motion for summary judgment.  *See Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) ("[S]peculation regarding the officers' motive cannot overcome the contrary evidence that . . . [the officer's] actions were benign.").  Accordingly, defendants are entitled to summary judgment on this claim.

### C.    Denial of Wheelchair

Plaintiff also claims that defendants Delvaux and Hunt were motivated by the 2012 lawsuit to deny him access to the unit wheelchairs, but again the evidence does not support his claim.  On the contrary, the undisputed establishes that Delvaux and Hunt had their own, non-retaliatory motivations for denying plaintiff access to a wheelchair:  (1) prison policy requires that inmates have a documented medical or special need to use a unit wheelchair or aide; (2) plaintiff did not have a documented medical need for a wheelchair in his health records; (3) plaintiff was evaluated by a nurse who determined that he did not have a medical need for a wheelchair; (4) Delvaux ordered that plaintiff not be permitted use of the wheelchair after learning about the nurse's evaluation; and (5) Hunt had previously allowed plaintiff to use the unit wheelchair, only denying plaintiff's access to a wheelchair after being directed to do so by Delvaux.  Additionally, as soon as Delvaux learned that plaintiff had been given a new medical assessment and an order for a wheelchair, she permitted him to use one.

In short, the overwhelming evidence establishes that it was the medical assessments – not plaintiff's 2012 lawsuit or settlement – that caused Delvaux to deny plaintiff access to the wheelchairs.  As for Hunt, it was the order by Delvaux, his superior, that caused him to deny access.  Since there is simply no evidence in the record from which a reasonable juror could conclude that the 2012 lawsuit motivated either defendant's actions, defendants are entitled to summary judgment on this claim as well.

### D.      Transfer to Racine Correctional Institution

Plaintiff's final retaliation claim is that DeYoung recommended that he be transferred to Racine in retaliation for the 2012 lawsuit.[3]  Specifically, he argues that DeYoung was motivated to recommend transfer after she learned sometime in 2014 that plaintiff was in settlement negotiations and had the potential to win the 2012 lawsuit.  As with his other retaliation claims, however, plaintiff has no evidence to support his theory that DeYoung was motivated by retaliatory intent.

Plaintiff's 2015 annual review was scheduled long before he entered into settlement negotiations in the 2012 lawsuit.  In previous years, DeYoung and plaintiff had discussed the possibility that plaintiff should be transferred to a different institution, in light of how long he had been housed at Oshkosh.  Although DeYoung had decided against recommending transfer in the past, she recommended transfer in 2015 for two reasons:  (1)

---

[3] Plaintiff suggests in his summary judgment materials that he engaged in other protected activities, such as filing a grievance and being a "known litigator" that could have motivated DeYoung to retaliate against him.  The only retaliation theory on which plaintiff was granted leave to proceed in this case, however, is that the 2012 lawsuit motivated defendants.  Moreover, even if he had been granted leave to proceed on other claims, he has submitted no evidence suggesting that any other protected First Amendment activity motivated DeYoung's recommendation of transfer any more than did his 2012 lawsuit.

by that time, plaintiff had been at Oshkosh for 11 years, which was a significant length of time for an inmate to be housed at the same institution; and (2) plaintiff had not yet started any programming at Oshkosh that he could not get at Racine.  The classification committee ultimately agreed with DeYoung's recommendation.

Plaintiff does not dispute these facts.  Instead, he argues that the timing of DeYoung's recommendations suggests a retaliatory motive.  However, plaintiff's arguments are yet again based solely on speculation, rather than actual evidence.  Plaintiff has failed to submit any actual evidence from which retaliation could be inferred.  *See Willis v. Washington*, 172 F.3d 54 (7th Cir. 1999) (plaintiff must allege a "chronology of events from which retaliation can be inferred" to survive summary judgment).  For example, DeYoung was not a defendant in the 2012 lawsuit; nor has plaintiff provided any explanation as to why DeYoung would have particularly cared about the subject matter of that lawsuit; nor why she would have broached the subject of transfer with plaintiff *before* knowing of the lawsuit's existence.  Specifically, there is no basis for believing that the order or means by which inmates access canteen had any effect on DeYoung at all.  Finally, the timing is not even that supportive of plaintiff's theory, as DeYoung's recommendation to the classification committee came after the 2012 lawsuit had been pending for more than two years.  Since there is no evidentiary support for concluding that DeYoung's assessment or the committee's decision would have been more favorable but for plaintiff's 2012 lawsuit, drawing any relationship between the lawsuit and DeYoung's recommendation would be entirely speculative.  *See Rockwell Automation, Inc. v. National Union Fire Insurance Co. of Pittsburgh, PA*, 544 F.3d 752, 757 (7th Cir. 2008) ("mere speculation or conjecture will not defeat a summary judgment motion").  Because plaintiff has failed to refute defendants'

21

evidence that DeYoung had a sufficient, non-retaliatory basis for her recommendation to transfer plaintiff, defendants are entitled to summary judgment on this claim as well.  *See Covington v. Steinert*, No. 13-CV-379-WMC, 2016 WL 616589, at *8 (W.D. Wis. Feb. 16, 2016) (granting summary judgment where plaintiff presented no evidence to refute social worker's showing that her decision to recommend that plaintiff remain in a maximum security prison was based on non-retaliatory considerations).

## II.    Eighth Amendment Claim against Delvaux and Hunt.

Defendants Delvaux and Hunt are also entitled to summary judgment on plaintiff's claim that they violated plaintiff's Eighth Amendment rights by prohibiting him from using a wheelchair.  To establish his Eighth Amendment rights, plaintiff must show that the defendants were "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  Plaintiff must also demonstrate that defendants' deliberate indifference caused his injuries. *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999).

Here, plaintiff's claim fails without proof of a genuine issue of material fact with respect to whether either defendant was "deliberately indifferent."  Indeed, as discussed above, the undisputed evidence shows that Delvaux and Hunt prohibited plaintiff from using a unit wheelchair because he did not have the required medical authorization for that use.  There is also no dispute that this prohibition was based on the opinion of the nurse who evaluated him in HSU, and neither Delvaux nor Hunt had any medical basis for doubting the accuracy of the nurse's opinion.

Although plaintiff now argues that his need for a wheelchair was "obvious," this is clearly contradicted by the nurse who concluded he did not obviously need one.  Moreover,

as non-medical staff, Delvaux and Hunt were entitled to rely on the nurse's medical opinion that plaintiff did not need a wheelchair. *See Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008) ("in determining the best way to handle an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals"); *Perkins*, 312 F.3d at 875-76 (fact that jail officials relied on the opinion of doctors militates against a finding of deliberate indifference on the part of the jail personnel). Because the evidence establishes that defendants did, indeed, rely on the opinion of a medical professional, they are entitled to summary judgment on plaintiff's deliberate indifference claim.

## ORDER

IT IS ORDERED that:

1.  Plaintiff Terrance Shaw's motions for assistance in recruiting counsel (dkts. #30, #34, #94) are DENIED.

2.  Plaintiff's motion for summary judgment (dkt. #53) is DENIED.

3.  Plaintiff's motions for extension of time to submit certification of medical exhibits and to compel (dkt. #84, 89) are DENIED as moot.

4.  Defendants' motion to amend briefing schedule (dkt. #98) is DENIED as moot.

5.  Defendants' motion for summary judgment (dkt. #71) is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 6th day of January, 2017.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge